**INDUSTRIAL FABRICATING CO. et al.
v. CHRISTOPHER.**

No. 12066.

Court of Civil Appeals of Texas. Galveston.

April 14, 1949.

Rehearing Denied May 5, 1949.

Fulbright, Crooker, Freeman & Bates, M. S. McCorquodale, and Sam W. Cruse, all of Houston, for appellants.

Earl Cox, of Houston, for appellee.

CODY, Justice.

This is an appeal from a judgment for $76,750 against James H. Lightfoot, individually, and as (a) an individual doing business as the Industrial Fabricating Company and (b) as the Lightfoot Lumber Company, which judgment was awarded

appellee on account of damages resulting from the collision between a truck belonging to appellant and an automobile which belonged to appellee and her deceased husband. Of the recovery so awarded, $50,000 thereof was on account of the death of appellee's husband; $25,000 thereof was on account of injuries suffered personally by appellee and the remaining sum of $1750.00 was awarded on account of medical expenses, funeral expenses and damages to the automobile aforesaid. The collision occurred on the night of October 22, 1947, in Walker County. The case was submitted to the jury on 28 special issues. The present suit is one which has been consolidated.

Appellant predicates his appeal upon the following six (6) points:

1. The error of the Court in refusing to grant appellants' motion for mistrial based on the conduct of appellee's witness Ellisor, and several of the jurors.

2. The error of the Court in refusing to permit counsel for appellants to cross-examine and impeach the witness, Mrs. Lena Belle McDonald, after appellee had introduced testimony from her deposition into evidence.

3. The error of the Court in instructing the jury not to consider argument to the jury by counsel for appellants, as follows: "Buster Brown is staring the penitentiary in the face. Here are some people, they are hurt and their attitude is going to have a lot to do with showing what transpired there. Every man on this jury knows that."

4. The error of the Court in refusing to grant a new trial upon the ground that the verdict awarding Mrs. LaNelle Christopher $50,000 for the death of her husband is grossly excessive, is not supported by the evidence, and is so excessive as to show manifest sympathy, bias and prejudice on the part of the jury.

5. The error of the Court in refusing to grant a new trial upon the ground that the verdict awarding Mrs. LaNelle Christopher $25,000 for her personal injuries is excessive, is not supported by the evidence, and is so excessive as to show manifest sympathy, bias and prejudice on the part of the jury.

6. The error of the Court in refusing to submit to the jury appellants' special requested Instruction No. 1 defining scope of employment.

We overrule appellant's first point relating to misconduct of appellee's witness Ellisor with several of the jurors. The facts of the misconduct in substance are these:

Ellisor is a truck driver who lives in Houston County out in the country from Crockett. Not long before the collision he and Buster Brown, the driver of appellant's truck, had some beer together. Thereafter they proceeded in their respective trucks towards Huntsville, Ellisor driving in the lead. When Ellisor heard the impact of the collision he knew what had happened instantly and turned back to the scene of the accident. The main contention of appellant was that Brown was not in the course of his employment at the time the collision occurred. Appellant himself brought out in the evidence that Brown was under indictment on account of the accident at the time of the trial. Appellant makes no contention that Brown was not shown, by the evidence at the trial, to have been clearly negligent.

Ellisor attended the trial, which was held in the city of Houston, which is appellant's place of residence, as appellee's witness. Houston is more than 100 miles from where Ellisor lives in Houston county. The trial opened Tuesday morning, June 29, 1948, and the court at once placed the witnesses under the rule and instructed them and the jurors not to talk to each other. On Wednesday, June 30, after Ellisor had testified, the Honorable Roy F. Campbell, in whose court the case was tried, observed, when he got off of the elevator, Ellisor giving a cigar to one of the jurors. The judge at once reprimanded Ellisor and the jurors present and then instructed the witnesses and the jurors again that there must be no talking between them.

On Thursday, July 1, at the mid-afternoon recess, Ellisor got the attorneys to excuse him from further attendance on the court on the grounds that he wanted to drive to his home. The court was not consulted. During the same recess, appellant's counsel, while taking refreshments at the

cold drink and coffee stand on the first floor, observed Ellisor in conversation with two jurors who were also at the drink stand and they heard Ellisor say that he would come back to meet one of the jurors at 5:00 o'clock that afternoon. Appellant's counsel reported this incident to the court and when Ellisor returned about 5:00 o'clock, the court had him brought in to the courtroom and examined him about the matter. Of course, this examination was out of the presence of the jury. In the course of the examination, Ellisor told the court that he did not know that the instructions not to talk to the jurors applied to him after he had been excused by counsel. The following is taken from the court's examination of Ellisor:

"A. I thought I was excused and you had a recess at that time and I went downstairs, and the jurors were down there and they were drinking coffee and I drank a coke and they did not say anything to me, and I said 'Gentlemen, I am dismissed from the case, I am going home,' and one of them a juror said, 'I would like to see you before you leave,' and I said 'all right, I'll be back here at approximately five o'clock,' and that was all. As far as we discussing the case I did not care if it went in the lady's favor or the boy's favor or what—that gentlemen (appellant) over there has liability insurance on his truck.

"Q. Who informed you that he did, go ahead and tell me. A. All right, I will tell you, the insurance company came up and the prosecuting attorney came up to see me and wanted me to give an affidavit the way the accident occurred.

"Q. That is how you knew it. A. Yes, sir.

"Q. What was your purpose in coming back to see the juror at five o'clock. A. I knew his face and he wanted to see me, we might have been old friends, I don't know.

"Q. You had been asking to be excused from the case so you could go home. A. Yes, sir.

"Q. You stayed from three to five to see the juror, is that right? A. I could not do anything else.

"Q. You could have gone home. A. That is right."

After the coming in of the verdict, which was several days later, the court told the jurors, among other things, that it was with reluctance that he was going to question them; that he was not accusing any of them of dishonesty, but that it was his duty to inquire into violation of his instructions against witnesses and jurors talking to each other and that "I have Ellisor out in the hall and to be frank I do not know what I am going to do with him. I should put him in jail, I do not know if I will or not, but he has flagrantly violated my orders after he was specifically instructed not to do that. I am going to ask you twelve men how many of you talked with the witness Ellisor." Thereupon the court examined the jurors who reported that they had spoken to Ellisor.

W. O. Tidmon was the juror who told Ellisor at the coffee stand that he wanted to see him before he left. He explained to the court that he knew some people at Grapeland (not far from Crockett) and he wanted to ask about them. The juror Bean was with Tidmon at the coffee stand at the time of the conversation between Tidmon and Ellisor and confirmed what Tidmon testified. The juror Clyde H. Bridge testified that, while in the company of four or five jurors standing in the hall not far from where Ellisor was sitting, something was said about Crockett and he, the juror, said he had done some telephone work around there and that about that time the bailiff came up and warned the jurors and witnesses not to talk. The juror J. D. Johns testified that he had said good morning to Ellisor and asked him how he was and that Ellisor replied O.K. Johns further testified that he always spoke to everybody, white or black and that he didn't suppose that the court meant for him not to do this.

In addition to the aforesaid incident of Ellisor giving the juror a cigar which the juror had asked him for, which matter the court had observed when he got off of the elevator, the evidence showed that Ellisor asked another juror if he wanted a cigar but the juror declined it showing Ellisor that he had one.

The court also, after he had concluded examining the jurors, again examined

Ellisor. At the conclusion of such examinations, appellant moved for a mistrial on the ground of the misconduct of Ellisor and the jurors. In said motion appellant stated "it is agreed that the policy limits" of the liability insurance carried on appellant's truck "are $50,000.00 for one accident or $25,000.00 for one person." It is further stated in the motion that the jury awarded $25,000 for personal injuries to Mrs. Christopher and $50,000 for the death of Mr. Christopher and it is further alleged in said motion "and a juror who might hear any one say it was a $25,000.00 and a $50,-000.00 policy would doubtless think that in returning a verdict for $25,000.00 in one case and $50,000.00 in the other they were requiring the insurance company to pay the two amounts without penalizing the policy holder." (Perhaps it should be here stated that nowhere else in the record except in the recital of appellant's motion for mistrial, does it appear what the policy limits of the insurance on appellant's truck were. Perhaps it should be further stated that there was no direct evidence that the jurors knew that appellant's truck was covered with collision insurance. From affidavits attached to appellant's motion for new trial it would appear that there had been some speculation in the jury room whether appellant had insurance and if so whether or not it would be large enough to cover the award, but no complaint is here urged on that score.) The court in overruling the motion for mistrial said "The conduct of these jurors was reprehensible but I overrule the motion."

It is misbehavior on the part of a witness or juror to disobey the court's instructions. Without in any way minimizing the seriousness of such misconduct it is comprehensible that during the course of a trial after witnesses and jurors see each other in the courtroom, pass in the hall and rub elbows in the elevator and at the cold drink stand, that they would lose sight of the court's instructions and habits and custom of a lifetime might assert themselves when disinterested witnesses and jurors come into contact. Their situation is different from that of the parties and their attorneys. Parties and attorneys are not disinterested in the outcome of a suit. Any favor or courtesy shown by a party, his attorney or agent, to a juror might well be considered making interest with such juror. Before Rule 327 was adopted, which imposed the burden on the complaining party to show probability of injury by misconduct, such misconduct between a party, his attorney or agent, and a juror might be sufficient grounds for mistrial. But the authorities recognize that the situation of disinterested witnesses with respect to contracts with jurors differs from that of parties, their attorneys or agents. It is said in 39 Amer.Jur. 114:

"Contact between Witness and Juror.— All communications between witnesses and jurors are to be avoided, and a new trial will be granted for improper communications between them which tend to create bias or prejudice, but the mere fact of communications between witnesses and jurors is not, of itself, sufficient ground for a new trial. A verdict should not be set aside because a witness has been seen in conversation with a juror, where it is made to appear that there was no communication with reference to the case. Even in criminal cases a new trial ordinarily will not be granted if there is nothing to show that the communication between the jury and the witness was improper or that the party complaining was prejudiced thereby.

"Where treating is done by witnesses, the rule is naturally not so strict as it is when the treating is done by a party or his attorney; it has been held that no necessity for interference with the verdict arises where a witness innocently and inadvertently treats the jurors during the progress of the trial".

It having been established by a preponderance of the evidence that the jurors and the witness Ellisor were guilty of misconduct in respect to matters which upon their face were no more than incidents of mere common courtesy, the question of injury to appellant is one of law for the trial and for the reviewing courts. See Rule 327; Barrington v. Duncan, 140 Tex. 510, 515, 169 S.W.2d 462, 465; Watson v. Texas Indemnity Ins. Co., Tex.Sup., 210 S.W.2d 989. And in determining the question of injury the entire record is to be looked to. As indicated

above, none of the issues in the case were highly doubtful except the issue of whether Brown was in the course of his employment. Ellisor's testimony did not relate to that. The communications, which were proved up, had no relation to the case. We think that the court did not err insofar as he overruled the motion for mistrial because of the misconduct on the part of Ellisor or the jurors, which was established by the direct evidence of Ellisor and the several jurors.

Indeed, we do not understand that appellant contends that the acts or communications between Ellisor and the jurors, which were proved up, were in and of themselves prejudicial to appellant. We understand that it is appellant's contention that there is no way of knowing whether there were other communications between Ellisor and the jurors which were not innocent. That Ellisor and the jurors would not likely admit communications which were not innocent especially after the court made it known he was considering jailing Ellisor. We understand that it is appellant's contention that the verdict itself constitutes circumstantial evidence that there was a communication by Ellisor to the jurors that (a) there was a policy of insurance covering the truck and (b) what its policy limits were.

█ The burden was on appellant to establish the fact of any specific misconduct by the preponderance of the evidence. Rule 327; the Barrington case, supra; and the Watson case, supra. We have shown that there was direct evidence that Ellisor knew that insurance was carried on the truck. But there is no direct evidence that he knew the insurance limits, and there is no direct evidence that he communicated his knowledge about the case to any juror except from the witness stand. The verdict awarded $50,000 for one person in the collision, and awarded $25,000 for another person in the collision. This admittedly did not come within the policy limits. We need not inquire whether such direct evidence would have been sufficient to support a conclusion by the court that Ellisor was guilty of communicating to any of the jurors the information that the truck was covered by in-

surance, and what the policy limits were. This, because manifestly such direct evidence was insufficient to compel the inference of such communication. The trial court's presumed finding that no such communication occurred, or was proven by the complaining party, is binding on the fact.

█ In this connection we desire to state that we have taken note of the decision of the supreme court in Scoggins v. Curtiss & Taylor, 219 S.W.2d 451, where the Supreme Court held that separate acts of misconduct may be sufficient when combined to require that the verdict be set aside. But in the cited case each act of misconduct considered by the court was definitely established by the evidence and its nature was distinctly prejudicial.

We overrule appellant's second point which complains that it was reversible error for the court to refuse to permit appellant to cross-examine and impeach the witness, Mrs. Lena Belle McDonald, after appellee had introduced testimony from her deposition and the evidence.

Mrs. McDonald is the mother of Buster Brown, the driver of appellant's truck. Her deposition was taken before the trial by appellee and appellant filed cross-interrogatories. One of the important issues in the case was whether or not on the occasion in question, Buster Brown was acting in the scope of his employment by appellant. It was appellant's contention, which was supported by his testimony given on the trial, that Brown was not acting in the scope of his employment in driving the truck at the time of the collision.

Appellee introduced from the direct interrogatories of Mrs. McDonald, her deposition to the effect that on the evening of the day following the collision she talked from Crockett over long-distance to appellant who was in Houston and that in that conversation appellant told her not to worry because he had instructed Brown to make the trip. In answer to cross-interrogatories, Mrs. McDonald answered that she had not been told in said telephone conversation that appellant had instructed Brown to make the trip. This testimony, appellee also introduced into evidence. And

again on re-direct examination, Mrs. Mc-Donald again deposed to the same effect as she had testified in answer to the direct interrogatories, repeating that appellant had told her that he had instructed Brown to make the trip. This testimony, appellee also introduced. Immediately after introducing the testimony from Mrs. McDonald's depositions, appellee rested.

When appellee announced that she rested, appellant stated that since Mrs. McDonald was present in person as a witness that he would examine her in person (in this connection it should be explained Mrs. McDonald was present in person as a witness, under subpœna by appellant). Appellee objected to appellant's announced intention to cross-examine Mrs. McDonald in person. The court thereupon ruled that appellant could not put Mrs. McDonald on the stand for the purpose of cross-examining her in person and asked appellant if he wished to put her on the stand. Appellant announced that he would put her on the stand and that they would then find out whether the questions were proper. Mrs. McDonald was then placed on the stand by appellant and sworn, and after some preliminary questions, the following proceedings occurred:

Defendant: Mr. Lightfoot (i. e., the defendant below and appellant here) did not tell you he instructed Buster Brown to get in the truck that night and drive to Houston, did he?

Plaintiff: We object that this is leading.

Defendant: The plaintiff offered this witness.

Plaintiff: I offered her deposition.

Court: I understand that.

Defendant: They offered the testimony of the witness and we have the right to cross-examine her.

Plaintiff then objected and asked that the jury be instructed to disregard the statements, which objection the court sustained.

Defendant: I would like to offer it for impeachment purposes—the cross-examination of this witness when the deposition was taken (meaning that he wished to introduce cross-interrogatories from her deposition).

Plaintiff: We object to him impeaching his own witness.

Court: I overrule your objection, the law says you can impeach your own witness except the witness's bad reputation.

The defendant then offered such parts of the deposition as he desired.

Thereafter the following occurred:

Defendant: Now, Mrs. McDonald, you heard the question and answers I read to the jury.

Witness: Yes, sir.

Plaintiff: That is leading.

Court: I sustain the objection.

Defendant: I am going to take a bill.

The jury was then retired and appellant took his full bill.

The following then occurred:

Defendant: You are talking about when the accident was over, he (that is, defendant below and appellant here) said: (then reading from the deposition) "It is all right for Buster to come to Houston." (Then resuming the question personally) "You did not mean Mr. Lightfoot told you he gave Buster instructions to come to Houston."

Witness: I did not say that he did.

Plaintiff: That is cross-examination and impeachment of his own witness.

The court sustained the objection.

■ The court did not err in refusing to permit appellant to call Mrs. McDonald to the stand so that he could cross-examine her in person where appellee had introduced her deposition. Cook v. Denike, Tex. Civ.App., 216 S.W. 437, 440, error dismissed. The court in the case cited said: "The depositions of a witness cannot be blended with or merged into his testimony on the stand in person, and the taking of his depositions and their use by the opposite party from the one who took them does not change or alter a single rule as to the examination of the witness in person".

■ The truth is that, both when the legislature regulated the subject of depositions and later when depositions became the subject of regulation by the supreme court, the regulations relating to

depositions constitute a system in itself of pretrial procedure. See Rules 186–215. Full provision is made within the system for preserving the right of cross-examination by cross-interrogatories. And it will be noted that Rule 213 provides: "Depositions may be read in evidence upon the trial of any suit in which they are taken, subject to all legal exceptions which might have been made to the interrogatories and answers, were the witness personally present before the court giving evidence." But neither does said rule nor any other rule regulating the subject of depositions undertake to alter the rule which regulates the examination of a witness in person. And it is well settled in Texas that, regardless of whether new matter is brought out on cross-examination, the witness is the witness of the party who put him on the stand, and this, whether the "witness was subpoenaed by the opposite party or made a deposition that was introduced by such party." 45 Tex.Jur. 191-192. Again, "The fact that a deposition taken by one party is used in evidence by his adversary does not entitle the party who took it to place the witness on the stand for the purpose of cross-examination." 44 Tex.Jur. 1143. Appellant relies on the holding made in Bernard's, Inc., v. Austin, Tex.Civ.App., 300 S.W. 256 (writ refused), as changing the rule announced in Cook v. Denike supra. We disagree with this contention. The relevant facts in Bernard's, Inc., v. Austin were these: The plaintiff there took, and introduced into evidence portions of, the depositions of one Kaufman, who was an employee of the defendant in the case. After plaintiff introduced depositions of Kaufman in evidence, defendant placed Kaufman on the stand and examined him personally. The appellate court expressed doubt whether or not Kaufman's personal testimony contradicted his testimony given by deposition but for purposes of the opinion assumed that there was such contradiction. Anyway, because the trial court thought that Kaufman's personal testimony contradicted his deposition testimony, the court permitted the plaintiff to impeach Kaufman by proving by him that he had been convicted and served time in the penitentiary. The appellate court very properly held that this constituted reversible error and the appellate court expressly ruled that appellee's right to impeach Kaufman did not extend to the right to show that "he had been convicted of a crime, any more than the right to impeach under such circumstances by proving that his general reputation for truth and veracity was bad, would have been fair to appellee." This ruling by the appellate court was a necessary consequence of applying rule 213 above quoted.

However, in the course of the opinion, the court did state "Kaufman was appellee's witness, as the deposition offered and read in evidence by appellee was taken by appellee." The point, which was there before the court for decision, was whether the plaintiff had the right to impeach Kaufman, not by showing contradictory statements made by Kaufman at another time, but by showing bad character. For purposes of presenting the point there to be ruled on, we think that it can be said that the quoted language was not loosely chosen. But the court certainly did not hold that by introducing the depositions of Kaufman and so making him plaintiff's witness so as to forfeit plaintiff's right to show bad character, plaintiff had made Kaufman his witness for the purpose of defendant placing him on the stand for cross-examination in person. Such a point was not there before the court. And no language was employed which indicated any intention to change the well established rule by which the act of placing a witness on the stand for examination in person during the trial makes the witness the witness of the party who tenders him in person as a witness. Certainly Bernard's Inc., v. Austin is not authority for so novel a proposition.

■ We overrule appellant's third point complaining of the court's action in sustaining appellee's objection to certain of appellant's argument to the jury. The bill of exceptions in support of the point, omitting the formal part reads:

"Buster Brown is staring the penitentiary in the face. Here are some people, they were hurt and their attitude is going to

have a lot to do with showing what transpired there. Every man on this jury knows that.

"Mr. Cox: We ask that the jury be instructed to disregard that statement.

"The Court: Was Brown on the stand?

"Mr. Cox: No, Sir.

"The Court: Gentlemen, do not consider that statement."

In support of his third point appellant states that his argument before the jury contained the following words which immediately preceded the bill of exceptions which he reserved and reads as follows:

"What did Mrs. McDonald say? You are not supposed to discard common sense and everything you know about human nature and everything you know about this world. You will remember and you have a right to bring into the jury box with you, your knowledge and experience as men of this world." Then follows the argument as set forth in the bill of exceptions. Appellant represents that he was arguing that Mrs. McDonald was falsifying her testimony wherein it had been to the effect that appellant in a telephone conversation with her had told her that he had instructed Brown to make the trip on which the collision occurred, because she was afraid if she testified otherwise that appellee's attitude might be such as would result in Brown, who was under indictment, being sent to the penitentiary.

It is appellee's answering contention that appellant has switched his position with reference to the ground on which he considered the argument admissible below; and in support of appellee's said contention, among other things, she calls attention to the fact there is no support in the record as to what the argument was except that which is contained in the bill of exceptions. We think that it is clear from the court's ruling, as contained in the bill of exceptions, that he considered that appellant was trying to either argue the credibility of Brown or undertaking to arouse the sympathies of the jury on behalf of Brown. Be that as it may, upon the face of the record as it is here presented this was a civil case for damages brought by appellee against appellant on account of the alleged negligent acts of Brown. Upon the face of the record as here presented it was improper for the jury to be called upon to consider the plight of Brown when the issues related to the damages of appellee. See Black v. Lowe, Tex.Civ.App., 123 S.W.2d 955.

We next take up, out of order, appellant's 6th point which complains that it was reversible error for the court to refuse to give appellant's specially requested Instruction No. 1 defining scope of employment. We must overrule the point.

The definition which was given by the court in the charge reads "By the term 'within the scope of his employment' as used in the foregoing special issue is meant while engaged in the service of his employer or while about his employer's business."

The definition appellant requested, and which the court refused, reads: "By the term 'within the scope of his employment' as used in the foregoing special issue is meant while engaged in that service of his employer which he was authorized to perform or while about such business of his employer as he was authorized to transact."

In International & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 520, 17 S.W. 1039, 1040, 27 Am.St.Rep. 902, the court said: "To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary of his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. For the mode in which the servant performs the duty he is engaged to perform, if wrongful, and to the injury of another, the master is liable, although he may have expressly forbidden the particular act. But whether the act in question can be implied from the general authority conferred upon the servant must, in gen-

eral, depend upon the nature of the service he is engaged to perform, and the circumstances of the particular case." The definition that was given by the court was approved in Hill v. Staats, Tex.Civ.App., 189 S.W. 85, writ refused; Missouri-Kansas-Texas Ry. Co. v. Salsman, Tex. Civ.App., 58 S.W.2d 1026; Gifford-Hill & Co. v. Henderson, Tex.Civ.App., 81 S.W. 2d 274; Felder v. Houston Transit Co., Tex.Civ.App., 203 S.W.2d 831, affirmed by the Supreme Court, 146 Tex. 428, 208 S.W.2d 880.

We overrule appellant's fourth point to the effect that the award of $50,000 to appellee for the death of her husband is so excessive as to show manifest sympathy, bias and prejudice. The evidence showed among other things that the deceased was 32 years of age, that he would have graduated from Sam Houston State Teachers College in the spring of 1948. That the deceased had specialized in Vocational Agriculture. That the course which the deceased was taking, and in which he was an "A" student, would have fitted him to be a Vocational Agriculture teacher under the Smith-Hughes Act, 20 U.S.C.A. § 15i et seq., and also fitted him to manage large farms, large dairy farms, and County Agent's work; soil conservation work, jobs in large feed concerns, etc. The jury could have inferred from the evidence that in a teaching position the deceased could have soon been earning as much as $4,640.00. The jury could have inferred that the deceased was an outstanding example both in physique and mentality. According to the American Experience Table of Mortality, which the jury had the right to consider, the deceased had a life expectancy of 34 years, though under the evidence they might well have reasonably concluded that he would live longer than the average life expectancy. See Hemsell v. Summers, Tex.Civ.App., 138 S.W.2d 865.

The court's charge submitted the present cash value to appellee of pecuniary benefits which she would have in reasonable probability received from deceased,—i. e. money or anything that can be valued in money. By the terms of R.C.S. Art. 4677, Vernon's Ann.Civ.St. art. 4677, the jury is empowered to give such damages as they think proportionate to the injury resulting in death, and to divide the amount among the persons entitled to sue,—in this instance appellee. Of course, every husband has a pecuniary value beyond the amount of his earnings by his labor or vocation. See Missouri Pac. Ry. Co. v. Lehmberg, 75 Tex. 61, 68, 12 S.W. 838, 840. The legislature intended that juries from their own knowledge, experience and sense of justice should affix and assess the proper sum. "They are expected to act uninfluenced by passion, prejudice, or partiality, and to pay due regard to the ascertained facts and conditions surrounding the subject. When it appears to the court that they have disregarded these requirements, their verdict should be set aside." Id. The court continues "On the other hand, when the court is unable to determine that these things have not been observed by the jury, and when it does not appear that the verdict is not the result of the honest endeavor of the jury to follow their own convictions, in the exercise of a power not precisely defined, we think the law intends that the jury's estimate, rather than the equally undefined one of the judges, shall prevail." Id. In the cited case the court sustained a verdict of $10,000 for the death of a husband and father who earned $1.25 per day.

We overrule appellant's fifth point. We think it sufficient to say that under the evidence set forth in appellee's brief in support of the award of $25,000 for appellee's personal injuries, we do not think the award excessive.

Judgment affirmed.