### SOUTHWESTERN GREYHOUND LINES, Inc. v. DICKSON.

### No. 9853.

Court of Civil Appeals of Texas. Austin.

March 1, 1950.

Rehearing Denied March 22, 1950.

White, Taylor & Chandler, of Austin, for appellant.

Critz, Kuykendall, Bauknight & Stevenson, by F. L. Kuykendall, of Austin, for appellee.

ARCHER, Chief Justice.

This suit was brought by Gladys L. Dickson, appellee, against Southwestern Greyhound Lines, Inc., appellant, in the 53rd District Court, Travis County, Texas, for damages for personal injuries allegedly resulting from her fall across appellant's water hose in the driveway at the rear of the bus station in the City of Austin, Tex-

as, on an occasion when appellee was going inside the station for the purpose of becoming a passenger on appellant's bus. This case was originally before this court as No. 9771 and was reversed and remanded on March 23, 1949, for certain errors, including improper issue, submission and prejudicial argument. Tex.Civ.App., 219 S.W.2d 592. Appellant prosecutes this appeal from a jury trial which resulted in a verdict and judgment for plaintiff for $28,246.

This appeal is predicated on six points assigned as error by the trial court in not granting a new trial, but may be grouped into three questions:

(1) That counsel for plaintiff was guilty of improper and prejudicial closing argument to the jury.

(2) That the jury was guilty of misconduct, and

(3) That the verdict and judgment are excessive.

The argument complained of was:

Counsel for Plaintiff: "Who is this woman?—Is she a liar? Is she a cheat? Is she a fraud? They would have you believe that she is an impostor; that she comes from a distant land."

Counsel for Defendant: "We have not charged she was a liar, cheat, fraud, or imposter; and I think counsel's argument is out of the record, and prejudicial and inflammatory, and the court should exclude it."

Counsel for Plaintiff: "They have said in their arguments—'What is her motive? Why did she testify to that; that you should carefully weigh her motives.' If that is not challenging her honesty and integrity, I don't know how they could express it in stronger words. Counsel in his closing argument said, 'No, she doesn't want to get well; she wants to wait until this lawsuit is over, and then she is going back to school.' If they said that about your wife or daughter, or if they said it about my wife, who had been injured as I believe this woman is, I think I would take it as a challenge to her honesty. * * *

"I think it is very material in this case to trace the history of this woman—She came back to Waco, Texas, where she had attended the public schools there, where she finished high school, where she lived most of her adult life, and the trustees there thought she was all right. They didn't think she was a cheat; they didn't think she was an impostor. They recognized her ability; they would not have hired her if they hadn't thought her reputation for honesty and integrity was all right.

* * * * * *

"Then she had the opportunity to go to McClosky Hospital. Don't think for a moment that before she was employed there that they didn't make an investigation to determine her character, her ability, her intelligence, her honesty and fairness. Certainly they did. She came there as a civilian assistant. I am telling you these things because they have accused this woman of being a liar, of being a malingerer, or being a faker."

Counsel for Defendant: "We object to counsel's argument as inflammatory, and out of the record. We did not say that she was a malingerer or a faker."

Counsel for Plaintiff: "I am telling the jury you don't believe what she said. If that is not calling one a liar, I don't know what you would call it. * * *"

Counsel for Plaintiff: "She went over there with the expectation of having pictures made, and if the doctor had been on time she could have. Was she trying to hide anything? Wasn't she willing to submit to an examination for the third time by the same doctor? But now they come up here and say, 'Well, they wouldn't submit to it again.' No, not after hearing the doctor testify, as far as I am concerned she will never, never be examined by him again, nor any other client of mine. When a man will testify as that doctor did, try to deny that the woman did not complain to him, saying something had happened to her, but when I pulled the record on him he shelled down the coin and said 'Yes.'"

"Do you think up to that time she had been fair? Do you think she has been

wrong? Do you think she waited to find out what was wrong with her? I will say she did. Nobody can question that at all. You will recall the last question I asked the doctor. I said, 'Doctor' and I had to ask it four times, and finally I got him to hush his mouth long enough until I could ask the question. I said, 'If a person was free of pain and could do his work before the accident, but since that time has had constant pain, wouldn't you say there was something wrong with her besides her knee?' Three times I asked him that, and he interrupted. Finally he let me ask the question, and finally his answer was, 'I don't know.' If a ten year old kid in answer to that question wouldn't say 'Yes,' there would be something wrong with this kid. It doesn't take a doctor to know that, yet he refused to answer it.

\*    \*    \*    \*    \*    \*

"You recall that when on the witness-stand I said, 'Doctor you have seen some of the correspondence between counsel for defendant and me regarding the re-examination, haven't you?' Well, he didn't answer the question and went on with his speech. I said, 'Isn't it a fact that you saw some of this correspondence between counsel and me?'

"Now, this doctor, I am sure, is a skilled surgeon. He said he devotes practically all of this time to it. I agree with them that he is a good cutting doctor; but if I have something wrong with me, and I don't know what it is, I don't want to go into his office and have him hit me with a hammer on my knees and elbows, and take my temperature and blood pressure and say, 'Oh, you are doing all right.' I don't want a fifteen minute examination if I am suffering as this woman has described her condition to be; yet the doctor in his report—and I offered the balance of it, and counsel said, 'We don't want the copy of the doctor's report—.'

\*    \*    \*    \*    \*    \*

"That June 5, 1947, examination was another one of those 15 to 20 minute examinations. The woman was suffering untold pain and he took that much time. He didn't want to waste time doing those things, because he was looking for whittling flesh; that is what he wants. He is not interested in giving a diagnosis; he was a cutting doctor."

Counsel for Defendant: "We object to the unwarranted attack on the doctor—that he was looking for whittling flesh. I think it is highly improper, and inflammatory."

Counsel for Plaintiff: "He devotes practically all of his time to surgery. You recall he was very nice here,—he said Miss Dickson was very co-operative, and they got along fine. Oh yes, she had a little fracture of her knee. It was not bad, —a little fracture; but he socked her $350 for it. Yet he says it was nothing. He took 17 stitches on her knee and charged her $350; but now that is nothing,—just a little thing. And finally, on direct examination, the last thing he said was, 'I don't think anything is wrong with her.' Well, I am reminded of a story in that connection that I think is very appropriate,— the story about the boy out fishing and he hooked a five or six-pound catfish, and the fish flopping around in the boat and he was trying to catch him to get to work on him, and finally the boy said, 'What's the matter, honey, I ain't going to do nothing to you except cut your guts out.' That is exactly what I say the doctor has done in this case."

Counsel for Defendant: "We object to that as highly inflammatory and unwarranted by the record."

Counsel for Plaintiff: "I said, 'Doctor, isn't it a fact that you saw some of this correspondence between counsel for defendant and me?' Why was the doctor so interested? I can tell you why. He ought to be getting some of the attorney's fees in this case, in addition to his medical fees.

\*    \*    \*    \*    \*    \*

"Of course he would not practice law, but his very actions on this witness-stand show that he is not a fair and impartial doctor; he is an advocate; or why was he so well informed about this re-examination correspondence between counsel for defendant and me."

The defendant timely took bills of exception to the above argument, to the rulings and action and lack of action by the court. The bills were approved, but with qualifications, making a part thereof the pertinent portions of the statement of facts and reciting portions of the argument of counsel for defendant,—a less portion we use.

"I tell you when anybody waits 26 months to find out that their back hurts, that kind of case ought to be viewed with careful suspicion. * * * And I suggest that on the testimony of somebody who has not taken any treatment or has not gone to any doctors for any treatment after their claim of a back injury, I say it looks like she is not trying to get well, but trying to get rid of her lawsuit. * * * But does she want help? The doctor says she can go back to teaching school. I wouldn't be surprised if she does as soon as this lawsuit is over. She went back to Baylor and took additional courses, and she did her work satisfactorily there and didn't become exhausted. I would be surprised if she didn't go back to work. She could do it in his opinion from the examination he made. * * *

"Now, in this case, you have on the one side the plaintiff, who is, of course, an interested witness, and you have her doctor who has been hired for examination purposes only and for this lawsuit; and on the other hand, you have * * *, whom they say is our doctor, but anyway she chose to go along with him. He performed the operation and he wanted to find out if she would give him the opportunity whether she had any injury to her back, or sacroiliac joint. * * * What we have been trying to find out by expert legal knowledge but not by anybody else, is what is wrong with her back. She claims there is something wrong with it, and that is her privilege; but it is also our privilege to find out what is wrong with her and to find out from people who ought to know and who are in position to know, and we have been denied that privilege. * * * We can only take what they want to hand us. They say, 'Look at our pictures.' We say, 'They are negative and incomplete and inconclusive. They don't show anything

about an injury.' We don't say that she hasn't an injury; we don't know, unless we can make additional X-ray pictures and explore into this case. If there is an injury there, why hold back? Why not open the books and say, 'There it is, gentlemen, you can have as many doctors as you want to. I have a sacro-iliac that is misplaced and it is 26 months before I knew it, but turn your doctors loose and I will prove to you that I have the injuries I claim.' * * *

"Let's see what else we have here. On the one hand, we have her, who is interested, and you have her doctor, who is hired just to give testimony in this lawsuit. On the other hand you have those doctors in Waco * * * doctors she knew and had before, and we bring you their testimony here, and they tell you the same story that, 'We don't know anything about anything, except an injury to her knee cap; that is all we ever found; that is all we know anything about; that is all she ever told us about.' * * *

"Now, one of the doctors told you that in his opinion if she had any kind of injuries like that, certainly it would have developed a long time ago; her back would have hurt and she would have gone to some doctor and said, 'My back is hurting,' and he would have discovered it. She says a naturopath discovered it—a man who is not even licensed, a man she doesn't even bring here. A man who didn't make a single X-ray picture to see if she had a fracture, a man who didn't even look at her back. She said, 'He didn't have to look at my back to find out my trouble.' And she went to Dr. ———, and he found the pathology that he was looking for. He is interested, and has testified in this case that he looked for the pathology. He was not trying to treat it. He was interested in proving her lawsuit, and helping her establish it. That is her privilege and his privilege. On the other hand, you have all those doctors in Waco who have no interest in this lawsuit, and you have (three local doctors), and you know their reputation, and they came to you here and said, 'Gentlemen, I can't tell you one thing about it unless you make some more pictures.'

So it is she and Dr. ——— against the whole field; that is this lawsuit. * * *

"She has no monopoly on the truth. She has no monopoly on being the only one who can know what happened. You are supposed to take all of it and weigh it. * * * I say it is possible that something might have happened; it is possible she could have a brain injury there, even though she didn't strike her head; it might be possible. But, gentlemen, when you wait 26 months and then you make the claim for the first time,—two days before you go to trial, and then you have X-ray pictures made and you won't let us see them, or examine them, until you come on the witness stand and offer them in evidence, and then ask for an examination, and we take her down to the doctor's office and she does everything up to the time to have these X-ray pictures made and then she refuses to have them made—I don't care whether she refused herself or by her attorney, it is one and the same thing; she refused to have those pictures made; she refused to go over there; they say we were trying a lawsuit and the court told us to be back at two o'clock, and that is the reason they didn't have them made, but just as soon as that case was over, we asked to have those pictures made again—additional pictures made so that our doctors could look at them * * *

"And I will stick with the record. Then the pictures were offered in evidence, and from that moment on we have asked her to submit to an examination by a doctor appointed by the court or by a doctor we would choose or by doctors that were selected with which we had absolutely nothing to do. She refused that on the advice of her counsel. That is her privilege to refuse; but, gentlemen, if there is something wrong with me and I had waited 26 months to find it out and I wanted somebody to pay me for it, I would not be afraid to walk into a hundred doctors' offices as long as they were reputable and high-class doctors and say, 'Here it is, my doctor found it. Let's allow your doctor to look at it.' That is what I call being fair and letting the jury have an oppor-

tunity to know the facts. We have not had that opportunity. * * *

"Three doctors looked at them, and every one said that they are inconclusive and negative and from those pictures made and offered in evidence, that they can not express any opinion as to whether or not she has any injury to her back, or whether she has a misplaced sacroiliac. We asked them, 'Could you have arrived at a definite opinion if you had some additional pictures made?' Everyone said, 'Yes,' that if they had additional pictures they could."

And further:

"I don't believe this accident occurred in any respect whatsoever by William Bacon moving that hose. Why should William Bacon come up here and tell you gentlemen that he didn't move that hose or jerk it, and why should Dodson come up here and tell you there was plenty of slack in there and there wasn't any occasion for Bacon to move it? Bacon isn't working for the bus company, hasn't worked for them in a long time. Dodson isn't working for the bus company; he hasn't worked for them in a long time. Dodson has been farming for a year or so. Now, what motive do those two men have to come up before a jury and tell you twelve men on this jury about those facts that did occur if they didn't occur? What motive did they have? Did they have any motive to try to keep this woman from getting money? Bacon was polite to her; went in and said if he did anything, he was sorry about it. Dodson helped her in, and did they have any motive or ill will against Mrs. Dickson? So what motive did they have to come up here and say these things if they are not telling the truth? * * *

"But on the other hand, there is a motive on the part of Mrs. Dickson. She, of course, has a lot at stake in this case. She has a lot at stake in this case. She would like to get seven or eight or ten or fifteen thousand dollars in this case; that is what she would like to get. She has something at stake. Bacon and Dodson don't have one nickel or one penny at stake in this case. And therefore, gentle-

men of the jury, I say when you talk about this preponderance of the evidence, this matter of the burden of proof being shown in this case, when there is a question of conflict, Bacon and Dodson on one side and Mrs. Dickson on the other, that they have failed to carry out the burden that is placed on them to show it, because they haven't even attempted to show any motive on the part of Dodson or Bacon to testify—have any motive to testify falsely against Mrs. Dickson. * * *

"Now, that is exactly—of course, it is an exaggerated situation, but that is the exact situation we have in this case here, is a woman complained she had a suffering in her back and she has all kind of trouble caused by this fall; she didn't have it before, and what does she have? She goes here for two years or more and then she comes down to Austin and has a doctor here to give her an examination and X-ray pictures, and then have him come up here and show what he finds from those X-ray pictures that he has. She is not willing at the time of this trial and hasn't been for some time to let us name a doctor to examine her, no. She has not been willing to let the court name some doctor to go out and examine her. * * * Now, then, gentlemen of the jury, if she is suffering as much as she claims to be, why didn't she say, 'Yes, I am willing to submit to an examination.' When people are suffering like they claim she is, they don't care how many doctors examine them, because they know they are not afraid to let the doctor see what it is that is wrong with them, but no, she won't do that. * * *

"What else is that? She went here for more than two years—26 months, to be exact, before she ever told a human specifically that she had any pains in her back. She didn't even tell her doctors that were waiting on her, treating her in Waco where she lived; she didn't tell them that her back hurt her. She said she told them she felt bad all over, but if you have curvature of the spine and your back is hurting, don't you think you would tell the doctor your back hurts when he is making an examination ? * * * I don't know why she

didn't want an examination. I don't know; it may be something back there that she is afraid these other doctors will find and tell this jury about, some condition she has had, maybe, since childhood; and one of the doctors said in here it is very probable that she did have that condition of the spine before this accident occurred, and every one of these other doctors that we have had here— and keep in mind she didn't bring any of her doctors down here that had her up in Waco, not even this man they call a naturopath, who is not a licensed doctor—I don't know what a naturopath is and won't try to explain it to you, because if I knew, I probably couldn't—but she didn't even bring him down here, the man that she says finally, two years after, found her back was hurting her, and the other doctors she went to herself without any recommendation from Dr. ——— or anybody else, doctors she went to in Waco, didn't bring them here. Two doctors came here before you with depositions. They were not depositions taken by her but depositions taken by us, and the only part they introduced was part of their cross-examination when they were there and had an opportunity to cross-examine. In other words, it took us to bring their own doctors before you; and the other doctors, she had since left them. She didn't go to Dr. ——— for treatment, no,—just for an examination for this trial, and she refused to go to any other doctor."

We have copied herein the portions of the argument of counsel for defendant so that we might be in a better position to determine if the argument complained of was in answer to the argument of counsel for defendant.

It is observed that in the course of the argument one of counsel stated, "that kind of case ought to be viewed with careful suspicion," and further, "it looks like she is not trying to get well, but trying to get rid of her lawsuit"; and continued, "the doctor says she can go back to teaching school. I wouldn't be surprised if she does as soon as this lawsuit is over"; and further that the plaintiff was an interested witness, and her doctor, who has been hired just to give testimony in this lawsuit, that

he was not trying to treat her, but in framing her lawsuit and helping her establish it; that she has no monopoly on the truth. "I say it is possible that something might have happened," but "when you wait 26 months and then you make the claim for the first time" and then refuse to have X-ray pictures made. "That is her privilege to refuse; but, if there is something wrong with me * * * I would not be afraid to walk into a hundred doctors' offices and say, 'Here it is * * * look at it.' That is what I call being fair and letting the jury have an opportunity to know the facts. We have not had that opportunity."

Another of defendant's counsel stated: "I don't believe this accident occurred in any respect whatsoever by William Bacon moving that hose"; that there was no motive that would cause the two witnesses to tell the jury about those facts that did occur if they didn't occur and if they were not telling the truth. "But on the other hand there is a motive on the part of Miss Dickson. She, of course, has a lot at stake. * * * Now, then, gentlemen of the jury, if she is suffering as much as she claims to be, why didn't she say, 'Yes, I am willing to submit to an examination.'"

Counsel for plaintiff observed in his closing argument: "Who is this woman? Is she a liar? Is she a cheat? Is she a fraud? They would have you believe that she is an impostor." And when a statement was made by counsel for defendant that they had not charged that she was a liar, cheat, fraud, or impostor, counsel for plaintiff stated, "They have said in their arguments, 'What is her motive? Why did she testify to that; that you should weigh her motives.' If that is not challenging her honesty and integrity, I don't know how they could express it in stronger words"; and that counsel for defendant had stated that "she did not want to get well, 'she wants to wait until this lawsuit is over, and then she is going back to school.' If they said that about your wife or daughter, or if they said it about my wife, who had been injured as I believe this woman is, I think I would take it as a challenge to her honesty." That the trustees of Waco thought she was all right;

they didn't think she was a cheat or an imposter; that the hospital made an investigation of her character, ability, intelligence, honesty and fairness. "I am telling you these things because they have accused this woman of being a liar, of being a malingerer, or being a faker."

Upon objection to such argument counsel for defendant stated that they had not said she was a malingerer or a faker; and counsel for plaintiff continued: "I am telling the jury you don't believe what she said. If that is not calling one a liar, I don't know what you would call it."

This phase of the argument complained of was contained in defendant's bill of exception No. 1, which was qualified as hereinabove noted.

Further complaint to the closing argument was embodied in defendant's bill of exception No. 2 briefly as follows: She went to the doctor's office expecting to have pictures made—the doctor was late. "Was she trying to hide anything? Wasn't she willing to submit to an examination for the third time * * * But now they come up here and say, 'Well, they wouldn't submit to it again.' No, not after hearing the doctor testify, as far as I am concerned she will never be examined by him again, nor any other client of mine." When the doctor testified that she did not complain, but when "I pulled the record on him, he shelled down the coin and said 'Yes'."

Objection was made on grounds of an unwarranted abuse of witness; further argument concerning the nature and type of the examination given, type of practice by the doctor, and the recitation of the story about the boy and the fish, with the finish,—"What's the matter, honey, I ain't going to do nothing to you except cut your guts out." This evoked loud laughter from a juror. Then further counsel for plaintiff remarked that the doctor was so interested that he ought to be getting some of the attorney's fees, in addition to his medical fees.

An objection was sustained to this remark. Counsel for plaintiff then continued: "Of course, the doctor would not prac-

tice law, but that his very actions on the witness-stand show that he is not a fair and impartial doctor; he is an advocate, or why was he so well informed about this re-examination correspondence between counsel."

The above mentioned bill was approved with qualification that the pertinent portions of the statement of facts be added thereto and made a part thereof insofar as they may apply to or affect the matters set out in such bill.

Appellee, on February 4, 1946, entered appellant's bus station in Austin, Texas, for the purpose of becoming a passenger; that it became necessary for her to cross a water hose lying in her pathway on appellant's premises near the entrance of the station; that as she attempted to cross the hose it was moved or jerked by appellant's employee in such a way as to come in contact with appellee's foot and leg; that as a result of such incident appellee was caused to fall flat on the concrete floor with her arms outstretched; that her knee struck a concrete step with a metal flange at the top. The evidence also shows that as a result of this accident appellee suffered a broken kneecap and other injuries to her knee. There is evidence also that appellee suffered injuries to her back and sacroiliac, and that since this accident she has been unable to work or earn money, except in the amount of some $600 for tutoring a child. The main contentions upon this trial centered mainly around the extent or seriousness of appellee's injuries and the compensation to which she was entitled.

The first four points may be grouped together and treated as one question, since they are all assigned as errors of the trial court in not granting a new trial because of the improper argument of counsel for plaintiff, as hereinabove set out; and the error of the court in failing to rebuke and repress laughter by the jury during the closing argument of plaintiff's counsel, who alluded to a fish story, the substance of which is set out hereinabove; and the error of the court in not granting a new trial on account of the improper argument of plaintiff's counsel, in which the defend-ant was castigated as, "That is the kind of cattle you are dealing with."

When we come to consider the argument of counsel for plaintiff and compare it with that of counsel for defendant, there is found a reasonable relation. Not every vigorous or even harsh argument is so improper as to require a reversal of a case. In this case we do not believe that the argument of plaintiff's counsel as a whole was so inflammatory and prejudicial as to require a reversal of judgment on jury's verdict for plaintiff. In many instances it is difficult, generally, to determine if an argument that seems harsh or such as would inflame the minds of the jurors against the theory of the opposite side, and in all instances it can be said to be prejudicial to his interests but not to his rights. The test is—were such comments unreasonable or unfair in the eyes of the law? Pacific Employers Ins. Co. v. Gage, Tex.Civ.App., 199 S.W.2d 537.

The scope of argument by counsel to the jury is always under the supervision of the court. It is the duty of the court to maintain decorum during the trial of a case, and to require counsel to limit argument to the facts in evidence. Great latitude is allowed counsel in discussing the facts and issues; they may comment upon the bias or interests of the parties and witnesses.

The Supreme Court has announced two principal rules relating to the effect of argument made by counsel in the trial of a case.

"One rule is: If counsel goes outside of the record, or indulges in inflammatory language, in order to influence the jury to return a verdict favorable to his client, or if he gives the jury information not in evidence, calculated to injure the opposing side, and such argument is not in reply to argument of opposing counsel, this constitutes misconduct, and requires a reversal of the case; unless it clearly appears that no injury resulted to the other side. And it is the duty of the court upon its own motion to repress such argument. Where the argument of counsel

is so prejudicial or inflammatory that no instruction from the court would cure the error, the duty does not rest upon opposing counsel to object to the argument and request the court to instruct the jury not to consider same. This rule has long prevailed in this State, and has been approved many times.

\* \* \* \* \* \*

■ "The second rule is: If the argument is of such a nature or is made under such circumstances that if objection is made at the time, so that counsel can offer an explanation or make such corrections as will make such argument proper or harmless, or if the argument is of such a nature that its withdrawal by counsel or instruction by the court to the jury to disregard same will cure the error and render the effect of the argument harmless, the complaining party must object to such argument and request the court to instruct the jury not to consider same; and failure so to do waives the error." Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054, 1055.

■ The argument complained of was border line argument. In all cases involving alleged improper argument, each such argument must be considered from the standpoint of the particular case in which it is made. Texas & N. O. R. Co. v. Sturgeon, 142 Tex. 222, 177 S.W.2d 264. See Columbus Mut. Life Ins. Co. v. Oldham, Tex.Civ.App., 115 S.W.2d 694; 41 Tex. Jur., pp. 772–773, Sec. 56, p. 798, Secs. 74 and 75.

We are unable, having in mind a reasonable length of this opinion, to discuss each and every phase of the argument complained of, but have gone into considerable detail. We omit any further discussion of the argument than to say that the court promptly sustained objection to the use of the word "cattle." Texas & N. O. R. Co. v. Sturgeon, supra.

■ With reference to the fish story, which we believe could have been well omitted, we do not believe that it was so out of place or improper to cause further consideration of a reversal of this case.

■ There is also the related question of the conduct of the jury in laughing at the story. While no complaint is leveled at the story directly, there was complaint of the action of the court in failing to rebuke and repress laughter of the jury. As herein stated, it is the duty of the court to maintain decorum during the trial of a case. We do not believe that the conduct of the jury or juror was such as to show that the jury was influenced. 41 Tex. Jur., p. 797, Sec. 74, and cases cited.

■ By the fifth assignment complaint is made of the failure of the court to grant a new trial because of the evidence offered to establish misconduct of the jury, in that they discussed insurance, attorney's fees, newspaper accounts of a former trial, and the award made therein.

There was evidence of some discussion had of attorney's fees and insurance, but not by all or even heard by all, and by those who heard the words only one time; and then some juror stated that these matters were no concern of theirs.

The appellant called one of the jurors and the appellee called the other eleven jurors. The hearing was had before the court, who heard and observed the jurors as witnesses, and the evidence was conflicting as to what was actually said, done, and heard, and it was within the province of the trial court to believe and determine the facts. We would, therefore, be justified in presuming that the trial court did not believe that there had been any jury misconduct, for the reason that the trial court overruled the motion for a new trial. We do not believe that the alleged jury misconduct would justify a reversal of this case, and this assignment is overruled.

■ "Rule 327, Texas Rules of Civil Procedure, provides in substance that when the ground of a motion for a new trial is misconduct of the jury the court shall hear evidence thereof and may grant a new trial if the misconduct proved is material, and 'if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury prob-

ably resulted to the complaining party'. The question whether injury probably resulted to the complaining party from the misconduct is a question of law to be decided in the first instance by the trial court and on appeal by the reviewing court." Scoggins v. Curtiss & Taylor, Tex.Sup., 219 S.W.2d 451, 452.

"A reading of the above rule will disclose that its effect is to abolish the prior rule of reasonable doubt, and substitute therefor a rule which imposes upon the party asserting misconduct the burden not only of proving by a preponderance of the evidence that such misconduct occurred, but also of showing that such misconduct probably resulted in injury to him." Barrington et al. v. Duncan et al., 140 Tex. 510, 169 S.W.2d 462, 464.

See Stotts v. Love, Tex.Civ.App., 184 S.W.2d 308.

By the sixth point appellant assigns as error the failure of the court in not granting a new trial, or a substantial remittitur on account of the excessive award of the jury, in view of the argument, misconduct of the jury, extent of plaintiff's injuries, and other matters therein set out.

The jury awarded the plaintiff $27,500 for damages and $746 for doctor bills and hospitalization, or a total of $28,246.

The plaintiff was a single woman, thirty-eight years old at the time of the accident, a graduate of Baylor University, had done postgraduate work in Columbia University; had taught for a number of years; an employee at McCloskey General Hospital; had a civil service rating with salary from $2,430 to $3,727 annually; and was devoting her time to aphasia patients (veterans) at McCloskey Hospital; that she was offered employment at McCloskey Hospital at $4,000 annually, but was physically unable to accept the job; that there is a demand for instructors who can teach aphasias; that there is a great demand for such teachers; that she was qualified to do this work, both by training and experience.

The first injuries complained of were to her knee, which were treated. She remained in the hospital from February 4, 1946, until March 6, 1946; she used crutches for five months and a cane for an additional five months; she had pains all over her body; she did not know at that time that her back had been injured; she was treated by a physician in Austin and by physicians in Waco; prior to the accident she was in good health and was employed continuously; that since the accident she has earned only a small amount; that she had a life expectancy of 26.81 years.

One physician testified that her knee had a permanent disability of 25 or 30 per cent and that such condition would not improve; that her right hip bone was about one-half inch lower than the left; that arthritis was beginning in the sacroiliac joint; that the condition of this joint would almost certainly bring about a curvature of the spine; that her position in walking was not normal; that he took X-ray pictures which were offered in evidence; that pictures taken in April 1948 and in June 1949 were the same, and that because there was no improvement he was of the opinion that her back condition was permanent; that, in his opinion, the fall received by the plaintiff could produce the condition of her back as he found it; that, in his opinion, she would never be able to engage in any work that would require much exertion; that her sciatic nerve would be affected; that pain would be caused to the whole lower back; that the condition of her back could not be cured, but would grow worse.

A physician, an X-ray expert, testified that he would not venture an opinion as to whether the appellee had an injury to her back unless he made the pictures in more than one position.

An osteopath physician testified that, in his opinion, there was a curvature of the spine, which would cause a lot of pain; that the pictures taken were good.

The physician who treated the plaintiff at the time of the accident testified that he sent the plaintiff to the hospital and gave her treatment, operating on her knee about a week later, taking seventeen stitches and put a steel wire around the fracture; that he discharged her about six

weeks later; that he saw her again in August for fifteen or twenty minutes; that he was unable to form any definite opinion as to whether she had any injury to her back; that, in his opinion, she could go back to work.

Other physicians testified by depositions and detailed phases of the injury and of treatment; but no useful purpose could be had by setting out this evidence.

The jury saw the witnesses who testified in person and heard all of the testimony, and decided the disputed questions of fact favorably to the plaintiff, and returned its verdict for the amount herein set out. The trial court observed the demeanor of all witnesses, and having overruled a motion for a new trial and not having required a remittitur, it is presumed that he was of the opinion that the · amount of the award was not excessive.

 "It is the peculiar province of the jury to find the facts of the case, and no court has the right to substitute its own findings of fact and render judgment thereon in opposition to the findings of fact by a jury." Wichita Falls Traction Co. v. Cook, 122 Tex. 446, 60 S.W.2d 764, 768.

Then, too, in Guinn v. Coates, Tex. Civ.App., 67 S.W.2d 621, 623, the court said: "It is peculiarly within the province of the jury to weigh opinion evidence, and the judgment of experts, even when unanimous and without positive contradiction, will not necessarily be conclusive. To hold otherwise would be to shift the most important function of the jury to expert witnesses."

On the issue of excessiveness, every judgment must stand on its own facts. Marsh v. Williams, Tex.Civ.App., 154 S.W. 2d 201.

As stated in the case of Herrin Transportation Co. v. Peterson, Tex.Civ. App., 216 S.W.2d 245, 249 (Error Ref.): "The measure of damages in a personal injury case is not something that can be measured by a mathematical yard stick. Considerable discretion and latitude must necessarily be vested in the jury and each case must be measured by its own peculiar facts." Kimbriel Produce Co. v. Webster, Tex.Civ.App., 185 S.W.2d 198; 15 Am. Jur., p. 621.

The appellant has cited and quoted from a number of cases involving the question of excessive verdicts, which we have considered.

In Industrial Fabricating Co. v. Christopher, Tex.Civ.App., 220 S.W.2d 281 (Error Ref.N.R.E.), the court held that an award of $50,000 for death of 32 year old husband was not excessive; nor that an award of $25,000 to wife, plaintiff in the case, exclusive of medical expenses, etc., was not excessive.

The judgment of the trial court is affirmed.

Affirmed.